IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06CR122-MEF |
| | ) | |
| KENDALL R. WATSON | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on the Motion to Suppress, filed by the defendant, KENDALL R. WATSON ["Watson"], on 6 July 2006 (Doc. # 62 ). The government filed its response on 18 July 2006 (Doc. # 73), and on 27 July 2006, the court conducted an evidentiary hearing on the motion. In response to the court's order, the defendant also filed an Affidavit attesting to his intention to testify at the evidentiary hearing (Doc. # 72), and the government filed a Supplemental Response on 4 August 2006 which included a copy of pertinent records.

Upon consideration of the motion, the government's response, and the evidence adduced at the hearing, the Magistrate Judge concludes that the motion should be denied.

**I.  ISSUES**

Watson was indicted on charges of felon in possession of a firearm, carrying a pistol in furtherance of a drug trafficking offense and possession of a controlled substance (methamphetamine) with intent to distribute. All of these charges were based upon events that allegedly occurred on 16 November 2005.

Watson challenges the search of his truck on that date by a Montgomery Police Officer. Characterizing the encounter as a ***Terry*** stop, pursuant to the Supreme Court's opinion in ***Terry v. Ohio***, 392 U.S. 1 (1968), Watson contends that the officer did not have an objective, reasonable suspicion of criminal activity and that the items seized should be suppressed. Thus, as Watson's counsel stated at the beginning of the evidentiary hearing, the motion is premised upon "the validity of the stop".

## II.  FACTS

On 16 November 2005, a third shift officer with the Montgomery Police Department, Andrew Magnus ["Officer Magnus"] was patrolling (TR. 3-4). He was assigned to the K-9 division in patrol,[1] and his "primary duties [were] patrolling businesses and high crime areas" (TR. 4). As part of his standard briefing on that morning, Officer Magnus received a list of 25-30 of the most recently stolen vehicles in Montgomery and reviewed with fellow officers "some business burglaries . . . . in the area of Atlanta Highway from Carol Villa down to Eden East" in Montgomery (TR. 5). The list included "three full-size Dodge Ram pickup trucks", and Officer Magnus knew that there had been two recent burglaries in that area within the past two to three days (***Id.***).

At approximately 1:30 a.m., when all businesses were closed, Officer Magnus entered the back side of a shopping center on the east side of Carol Villa Drive and Atlanta Highway.

---

[1] As part of his assignment, Officer Magnus had a dog with him.

He knew that within two to three days before then, two businesses in the center had been burglarized (*Id.*). At that point, he observed Watson driving his truck, a "flat back Dodge Ram pickup" through the shopping center, at an approximate speed of "five miles an hour" (*Id.*). There was no other traffic in the parking lot (TR. 17, 44).[2] Watson acknowledged that he drove into the parking lot, enroute to a donut shop (TR. 43). After stopping at a gas station to pick up some food items, Watson continued to the donut shop, but found that it was closed (*Id.*). He then "kept going through the parking lot" trying "to take the groceries to [his] friend's house" (*Id.*).

With his lights off, Officer Magnus approached Watson and followed him "for about four blocks"; then he turned his lights on to observe the tag and attempt to secure an identification of the driver (*Id.*). When he received information that Watson had a suspended driver's license, he initiated a traffic stop (*Id.*). As his reason for stopping Watson, Officer Magnus said:

> The fact that it was coming from the area where we have had business burglaries, the suspended driver's license also, and the fact that it was doing five miles an hour through a residential area.

(TR. 5-6). The officer said that he considered it suspicious that Watson was driving five miles per hour "in a 25 zone at 1:30 in the morning" (TR. 20),[3] and he said that the "basis"

---

[2] Officer Watson also testified that the parking lot was "one-way-in and one-way-out" and that it was not "a cut-through parking lot" (TR. 17).

[3] When pressed to explain further, Officer Magnus stated that "either the parking lot was being cased and he was looking for something to break into, or that – that's usually what happens. I mean they usually go through an area at a slow rate looking for something they want" (TR. 20).

3

for his stop was "to see why he was coming from the area of closed businesses" (TR. 21). He then approached Watson's truck and asked him for his driver's license, advising him about the recent burglaries and of his plans to "run a warrant check on him" (TR. 9). Before he checked on warrants, Watson advised Officer Magnus that he was on supervised probation (TR. 9).

After determining that there were no outstanding warrants on Watson,[4] Officer Magnus returned to Watson, engaging him in conversation about the area businesses. Watson said he was looking for a friend's house (TR. 10). By that time, another officer arrived (*Id.*).[5] At that point, Officer Magnus had no reason to believe that Watson was involved in the recent burglaries (TR. 27).

However, Officer Magnus testified that he nevertheless asked Watson for permission to search the truck "to make sure there wasn't something that could be used to commit a burglary" (TR. 32). He also testified that Watson consented to the search (TR. 10). Watson denied that he gave his consent (TR. 45), but acknowledged that he signed the consent form. Watson then exited the truck and went to its front, near the hood, while Officer Magnus began the search. When he opened the driver's side door, he "saw the butt of what appeared to be a black pistol sticking out from in between the driver's side seat and the center console" (TR. 11).

---

[4]In fact, the license check revealed that the truck belonged to Watson's father (TR. 16).

[5]Officer Magnus did not summon the other officer, also a K-9 officer, to the scene. He believes that the officer heard him on the radio and that he came to the scene as back-up (TR. 30).

Watson was then placed in physical custody, patted down, and questioned about the gun. According to Officer Magnus, he said that "it was a pellet gun that he used for shooting dogs at his house" (TR. 11). Officer Magnus then returned to his vehicle to retrieve a consent form, which he then explained to Watson. Watson signed it after clarifying that it was a consent to search the vehicle, not his house (TR. 12).

Officer Magnus removed the pellet gun from the car and resumed his search. He then found two rolls of money at the bottom of the center console. Each roll included $2,000.00 (TR. 14-15). Upon continuing his search, he found a ski mask, another pistol, and a set of digital scales (TR. 15).

## II. DISCUSSION

Acknowledging that his encounter with the police officer is appropriate characterized as a *Terry* stop,[6] Watson challenges the officer's reasonable suspicion to make the traffic stop.

### A. *Analytical Framework*

The Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, *see U. S. CONST. amend. IV*, extends to motorists stopped for traffic violations.[7]

---

[6]Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).

[7]A seizure within the meaning of the Fourth Amendment occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). It is well established that a traffic stop is a seizure which triggers constitutional protections. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996); ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'

The standards under *Terry v Ohio*, 392 U.S. 1 (1968), for police-citizen encounters which are "relatively brief," *see* **Berkemer v. McCarty**, 468 U.S. 420, 437 (1984), also govern the reasonableness of searches and seizures incident to traffic stops. **United States v. Purcell**, 236 F.3d 1274, 1277 (11th Cir. 2001), **cert. denied**, 534 U.S. 830 (2001) ("Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest"); **United States v. Perkins**, 348 F.3d 965, 969 (11th Cir. 2003), citing **Brown v. Illinois**, 422 U.S. 590 (1975).

The inquiry in the instant case, however, extends beyond a mere traffic stop. It is undisputed that Officer Magnus did not stop Watson for a traffic violation. While it is true that Watson's traveling at a rather slow speed of five miles per hour caught the officer's attention, Watson was not operating his vehicle illegally; nor was it illegal for him merely to drive his vehicle through the shopping center.

Officer Magnus' stop can best be characterized as an investigative stop, much like the stop in **Terry**. As the court recently stated in **United States v. Acosta,** 2004 WL 584572, at *3 (11th Cir. Mar. 25, 2004), **Terry** requires "a dual inquiry for evaluating the reasonableness of an investigative stop." **United States v. Sharpe**, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573 (1985) (**citing Terry**, 392 U.S. at 20, 88 S.Ct. at 1879); *see also* **United States v. Powell**, 222 F.3d 913, 917 (11th Cir. 2000).

Thus, under **Terry's** two-part inquiry, the court should first examine "'whether the

---

of 'persons' within the meaning of [the Fourth Amendment.]"*; Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied*,534 U.S. 830 (2001).

6

officer's action was justified at its inception.'" ***Powell***, 222 F.3d at 917 (quoting ***Terry***, 392 U.S. at 20, 88 S.Ct. at 1879), which turns on whether Officer Magnus had a reasonable suspicion that Watson had engaged, or was about to engage, in a crime, ***id.*** In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, the court considers 'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" ***Id.*** (quoting ***Terry,*** 391 U.S. at 20, 88 S.Ct. at 1879).

### B.    *The Legality of the Stop*

In determining the reasonableness of an officer's "specific and articulable suspicion of criminal activity", the court is bound to consider the "totality of the circumstances", ***United States v. Sokolow***, 490 U.S. 1, 7-8 (1989), "from the collective knowledge of the officers involved in the stop." ***United States v. Williams***, 876 F.2d 1521, 1524 (11th Cir. 1989). "This process allows the officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" ***United States v. Arvizu***, 534 U.S. 266, 273 (2002), ***quoting United States v. Cortez***, 449 U.S. 411, 418 (1981).

To be sure, on the date he observed Watson, Officer Magnus had no information about, or descriptions of, possible suspects in the burglaries, and he knew nothing about the means of breaking and entering (TR. 39). He knew that "a cinder block was used through the front window" of one of the burglarized businesses, however, but he had no information

about the vehicles used in the crimes, or whether vehicles were used (TR. 30, 39-40). In spite of the aforestated absence of information, and viewing the case in the totality of the circumstances, the court must accord weight to the following circumstances known or observed by Officer Magnus:

1. The shopping center was the site of recent business burglaries (TR. 5);

2. Watson's vehicle, a Dodge Ram pickup truck, was on a list of most recently stolen vehicles in Montgomery that Officer Magnus had received on the morning of the incident (TR. 5);

3. Watson was observed as the lone vehicle in the parking lot of the shopping center at 1:30 a.m. (TR. 17, 44); and

4. Watson was driving approximately five miles per hour in a 25 mile-per-hour zone (TR. 5-6).

The court concludes provided Officer Magnus with reasonable suspicion to make an investigative stop of Watson's truck, and that conclusion is consistent with the law of this circuit.

> [L]aw enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" ***United States v. Powell***, 222 F.3d 913, 917 (11th Cir. 2000) (citing ***Terry v. Ohio***, 392 U.S. 1 (1968)). Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers. ***United States v. Acosta***, 363 F.3d 1141, 1145 (11th Cir. 2004). "[W]hether reasonable suspicion existed at the time [of the

> investigatory stop] is a question of law to be determined ultimately by judges, not policemen . . . . [T]he question . . . is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search." *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005) (citing *Evans v. Stephens*, 407 F.3d 1272, 1280 n.9 (11th Cir. 2005) (en banc)).

*United States v. Nunez*, _____ F.3d _____, 2006 WL 1888957, at *2 (11th Cir. July 11, 2006).

It was precisely Officer Magnus's "experience and specialized training" that allowed him - and arguably required him - "to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The facts which he knew and later observed combined to constitute reasonable suspicion that the driver of the vehicle had engaged (e.g., the theft of the vehicle) - or was about to engage (e.g., the burglary of a business) - in criminal activity. That suspicion objectively justified the stop.

### C.  *The Legality of the Search*

Officer Magnus testified that Watson consented to the search, at first orally (TR. 10), then later in writing (TR. 12). Watson acknowledges that the signature on the consent form is his, but denies that he intended to consent to the search of his vehicle (TR. 45). Although Watson requested suppression of the fruits of the search, he did not specifically challenge the

9

search of his vehicle in his motion. Indeed, his motion is limited to a discussion of the stop and does not mention the search. However, the fact that evidence of the consent is nuanced warrants some discussion and analysis.

Law enforcement officials are required to obtain a warrant based on probable cause prior to searching even a vehicle. However, neither a warrant nor probable cause are required when a voluntary consent to search is obtained in advance. *See*, *e.g.*, ***United States v. Santa***, 236 F.3d 662, 676 (11th Cir. 2000); ***United States v. Butler***, 102 F.3d 1191, 1197 (11th Cir. 1997). To be voluntary, consent must be knowing and freely given and cannot, therefore, be the product of duress or coercion. *See*, *e.g.*, ***United States v. Purcell***, 236 F.3d 1274, 1281 (11th Cir. 2001).

Certainly, Officer Magnus was not required to have probable cause to ***request*** Watson's consent to search his vehicle. "[T]here is nothing constitutionally suspect in a person's voluntarily allowing a search", ***Schneckloth v. Bustamonte***, 412 U.S. 218, 243 (U.S. 1973), and "[a] warrantless search undertaken without probable cause is valid if conducted pursuant to consent." ***United States v. Butler***, 102 F.3d 1191, 1197 (11th Cir. 1997).

At the evidentiary hearing, Watson argued first, that he didn't intend to consent to the search of his vehicle and second, that after finding no evidence that he intended to commit a crime, Officer Magnus should not have detained him further. Notably, Watson has failed to cite a single authority which supports his argument.

Nor did he persuasively set forth the circumstances by which he signed the consent

10

form by mistake or inadvertently. In response to specific questions about the circumstances of his signature, Watson stated:

> He went to his car and got some paperwork out, wrote on the paperwork something about a Crossman, the pellet pistol. About midways of the paper it said something about Crossman . . . . I see his name on there a couple of times. He told me, he said sign here and we will let you go. I said well, what for? He said well, I am going to give you your pellet gun back and to cover my ass . . . That I went in your vehicle and grabbed and got the gun out of your vehicle and I am now giving it back to you, I have got to cover – I have got to do the paperwork is what he told me.

(TR. 46-47). The court is simply unpersuaded that the events transpired as Watson related.

First, Watson insisted that he repeatedly denied permission to search his vehicle:

> [A]t least 45 minutes had went [sic] by and he and the other guy that was with him kept asking me, let us search the vehicle, let us search the vehicle, and I kept saying no.

(TR. 46). Second, according to the pretrial services report, Watson has been arrested numerous times and has served time in prison or jail on at least two prior occasions. Under those circumstances, it is highly unlikely that he would inadvertently sign his name to "paperwork" proffered by a police officer after repeatedly rejecting a police officer's verbal requests to search his vehicle. It is even more unlikely that, having signed his name and observed the officers remove contraband from his vehicle, Watson would have refrained from requesting either a copy of the paper he signed or a review of the paperwork to verify the effect of his signature.

On the basis of these facts, the court concludes that Watson's consent was voluntary.

11

"Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances." ***United States v. Gonzalez***, 71 F.3d 819, 828, (11th Cir. 1996). The government bears the burden of proving that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily. *Id.* The government has met its burden in this case.

### III. CONCLUSION

Accordingly, for the reasons stated herein, it is the RECOMMENDATION of the Magistrate Judge that Watson's motion to suppress be DENIED.[8]

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before **14 September 2006.** A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982). *See* ***Stein v. Reynolds Securities, Inc.***, 667 F.2d 33 (11th Cir. 1982). *See also* ***Bonner v. City of***

---

[8] Watson entered his plea of guilty to the offense on 6 September 2006 (Doc. # 108).

***Prichard***, 661 F.2d 1206 (11th Cir. 1981, *en banc*).

DONE this 8th day of September, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE